Juan Diego Ariztegui,
*Plaintiff*,

v.

Sikorsky Aircraft Corporation, *et al*,
*Defendants*.

Civil No. 3:10cv672 (JBA)

March 28, 2011

## RULING ON MOTION TO DISMISS

Plaintiff Juan Diego Ariztegui filed a Third Amended Complaint, suing Defendants Sikorsky Aircraft Corporation ("Sikorsky"), United Technologies International Operations, Inc. ("UTIO"), Helicopter Support, Inc. ("HSI"), Schweizer Aircraft Corporation ("Schweizer"), and HSI President Samir Mehta, for breach of contract, in *quantum meruit*, for defamation, for breach of implied covenant of good faith and fair dealing, and under the Connecticut Unfair Trade Practices Act ("CUTPA"). Defendants move to dismiss Plaintiff's Third Amended Complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), claiming that Ariztegui lacks standing because he was not party to the contract, and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the following reasons, Defendants' motion will be granted in part and denied in part.

I.      Background[1]

A.      Contracts

Ariztegui is a citizen of Argentina who "does business in Argentina and in the United States under the name Ariztegui Representaciones Aeronauticas ('ARA')." (Third Am. Compl. [Doc. # 59] ¶ 1.) Sikorsky and UTIO are wholly–owned subsidiaries of United Technologies Corporation, a Delaware corporation with its principal place of business in Hartford, Connecticut. Effective November 2, 2005, ARA and UTIO entered into a "sales representation agreement" (the "UTIO SRA"), under which UTIO agreed to pay ARA commissions up to three percent of the net selling price for services as a sales representative in Argentina for Sikorsky's products and services, primarily helicopters, spare parts, and support services. (*See* Ex. A to Third. Am. Compl.) Ariztegui signed the agreement as "President" of ARA, and it provides that notices be sent to ARA to the attention of "Mr. Juan Diego Ariztegui, President." Effective December 1, 2005, ARA entered into a "sales representative agreement" with HSI (the "HSI SRA"), under which HSI agreed to pay ARA commissions up to three percent of net selling price for ARA's services as sales representative in Argentina for HSI's products and services, mainly aircraft spare parts and related equipment and services. (Ex. C to Third Am. Compl.) Ariztegui signed this document as "Chief Executive Officer" of ARA. Effective February 1, 2006, ARA and HSI entered into an "Independent Supplier Agreement ("the ISA") whereby ARA agreed to use

---

[1] In adjudicating a motion under Rule 12(b)(1) for lack of subject–matter jurisdiction, a court may consider material outside the pleadings, including "by affidavit or otherwise." *Kamen v. Am. Tel & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986). Reference to outside material, however, should not include "conclusory or hearsay statements contained in the affidavits." *J.S. ex rel N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004).

HSI as its preferred source in Argentina for products and services sold by HSI. This too was signed by Ariztegui as "Chief Executive Officer" of ARA. (Ex. D to Third Am. Compl.) The parties agreed in the ISA that HSI would be ARA's preferred source for reselling products to ARA's customers, and HSI would pay ARA a three percent rebate on all purchased parts and services. On or about October 12 and 18, 2007, ARA entered into a Sales Representation Agreement with Schweizer (the "Schweizer SRA"), whereby Schweizer agreed to pay ARA commissions up to five percent on certain aircraft and up to $40,000 on certain helicopters for his services as a sales representative in Argentina for Schweizer's products, which were mainly helicopters, other aircraft, and spare parts. (Ex. E to Third Am. Compl.) Ariztegui signed this document as "Owner – CEO" of ARA.[2]

Each SRA provides that "[e]ither party may at any time, terminate this AGREEMENT by giving written notice of such termination to the other at least thirty (30) days prior to the date fixed for such termination in such notice." The HSI ISA has identical language but a sixty day termination–notice requirement. Article II.B of the HSI, UTIO, and Schweizer SRAs provides that ARA "will use its best efforts to obtain responsible purchasers for the PRODUCTS within the SALES TERRITORY," including "[e]stablish[ing] and maintain[ing] contact with responsible potential purchasers of the PRODUCTS and recommend[ing] action required to effectuate sales opportunities in the SALES TERRITORY" and "[p]roviding such other assistance as [Defendants] shall reasonably request."

---

[2] The UTIO SRA, HSI SRO, HSI ISA, and Schweizer SRA, when referred to collectively, will be discussed as the "Contracts."

Plaintiff billed Defendants for his services under the Contracts with invoices that listed only his name and provided that payment be made to a bank account in his name that did not list ARA as a beneficiary. (*See* Invoices, Ex. 2 to Mem. Opp'n [Doc. # 37].)

B.      Helicopter Assessment

Beginning in 2006, Ariztegui regularly produced reports on pending and future expected sales and sales prospects to UTIO and HSI. In January 2007, the Executive branch of the Argentine government, the Presidencia de la Nación Argentina ("PNA"), requested assistance from Sikorsky to assess the technical and operational condition of its fleet of helicopters. (Third Am. Compl. ¶ 16.) In February 2007, a Sikorsky team from the offices of HSI presented a report to the PNA declaring the helicopters airworthy and safe to operate, and in May 2007, HSI sent to the PNA a Final Assessment Report for the assessed helicopters and an invoice, signed by Sikorsky. The PNA considered this final assessment unsatisfactory because the helicopters "continued to have maintenance problems that the PNA attributed to Sikorsky's poor technical procedures in conducting the assessment" and therefore refused to pay the HSI invoice. (*Id.* ¶ 19.) In response, HSI refused to supply parts to the PNA until the invoice was paid. (*Id.* ¶ 20.) Further, "[b]ecause of the ongoing dispute concerning HSI's services and the assessment report, the airworthiness of the Assessed Helicopters remained unresolved and the helicopters could not be used." (*Id.* ¶ 21.)

Ariztegui alleges that the PNA blamed him personally as the "exclusive representative of HSI and Sikorsky, for its inability to use the Assessed Helicopters while PNA and Sikorsky were disputing the value of the assessment services, thus damaging his personal and professional reputation and his relationship with the PNA." (*Id.* ¶ 22.) Under Article II.B.6 of both the UTIO SRA and HSI SRA, ARA was obligated to assist HSI and UTIO "in the

timely collection of accounts receivable," so Ariztegui "worked hard to get the PNA to agree to pay the disputed invoice even though he had not been involved in the assessment activities" (*id.* ¶ 23), with the result that PNA paid HSI. However, HSI "refused to pay Mr. Ariztegui any commissions/fees for this work even though Mr. Ariztegui had an exclusive relationship with HSI both as an independent supplier and as a sales representative." (*Id.* ¶ 25.)

        C.       Argentine Army Request for Proposals

In October 2008, the Argentine Army ("Ejército Argentino" or "EA") notified Ariztegui that it was issuing an official Public Bidding Tender for Auxiliary Fuel tanks for its UH–1H helicopter fleet, for which the EA would pay $1.2 million. Acting as an "independent supplier" under the HSI ISA, Ariztegui worked with HSI to provide technical information to the EA and obtained from HSI a price quote for the fuel tanks. (*Id.* ¶ 26.) On October 23, 2008, relative to the bidding for the UH–1H fleet, "HSI directed Mr. Ariztegui to cease acting under his Independent Supplier Agreement, indicating that it wished to have him proceed instead under the" HSI SRA. (*Id.* ¶ 27; Ex. F to *id.*) HSI instructed ARA to provide a "ballpark" price to the EA before the official public tender, for budgeting purposes, notwithstanding Plaintiff's warning that it should not, because the EA would "merely give the competitors the price." (*Id.* ¶¶ 28–29.) After Ariztegui provided the price to the EA, he anticipated, based on communications with HSI employee Adam Schierholz, that HSI would deliver a formal quote for Ariztegui to present in a formal bid to the EA, but HSI never did, which "deprived [him] of the opportunity to earn a commission on a potential $1.2 million sale." (*Id.* ¶¶ 31–32.)

D.    Sikorsky S–76B Helicopter Lease and Corrosion

As of 2008, the PNA leased a Sikorsky S–76B, for which it paid Sikorsky $200,000 per month.  Unknown to Plaintiff or the PNA, the Leased S–76B had been operated extensively over the ocean near New York City before being leased to the PNA and had sustained corrosion damage due to exposure to salt water.  (*Id.* ¶ 37.)  The corrosion was discovered in October 2008 by the PNA, which then grounded the aircraft for six months for evaluation and repair.  The PNA blamed Ariztegui as representative of HSI and Sikorsky for delivering a compromised helicopter, complaining to Plaintiff that he had "sold them rotten fish."  (*Id.* ¶¶ 39–40.)  Ariztegui worked with the PNA, Sikorsky, and HSI "to maintain relations and effect necessary repairs to restore the Leased S–76B to airworthy condition," but the corporate Defendants did not compensate Ariztegui "for his efforts and assistance in connection with the discovery and repair of corrosion on the Leased S–76B." (*Id.* ¶¶ 43–44.)

Under the lease agreement, the PNA had the right to purchase the Leased S–76B for approximately $1.9 million, equivalent to nine months of lease payments.  (*Id.* ¶ 45.)  In September 2008, the PNA formally issued a request for proposals, so it could purchase the Leased S–76B helicopter, the terms and conditions of which called for bids in writing by October 14, 2008.  Sikorsky drafted a proposal and sent it to Plaintiff to submit to the PNA. (*Id.* ¶ 48.)  On November 19, 2008, the PNA rejected the bid and refused to purchase the helicopter, claiming that Sikorsky had not complied with the terms and conditions of the Official Bid document.  (*Id.* ¶ 51.)

E.    Contract Termination

On February 25, 2009, during a break at a Sikorsky sales meeting in Anaheim, California, Ariztegui told Sikorsky Regional Sales Executive Ricardo Perez that he needed

to discuss business issues, and Perez responded that they had to talk about ethical problems that Adam Schierholz, a Sikorsky salesman, had accused Ariztegui of. (*Id.* ¶ 87.) Later that day, in a large room where Sikorsky was serving lunch to salespeople for the Americas, Schierholz, who was sitting at the same table as Ariztegui and Mehta, accused Ariztegui of ethical violations, and "Mehta acted as if that was the first time that he had heard of such an accusation against Mr. Ariztegui." (*Id.* ¶ 88.)

On April 14, 2009, Ariztegui presented his "sales funnel" to Sikorsky employees Emilio Filgueira, Freddy Hernandez, and Perez. (*Id.* ¶¶ 53, 56.) The sales funnel showed (1) "the probabilities of Mr. Ariztegui's expected future sales through 2010"; (2) "which of the Defendant's products and services would be sold to the Argentine government and to private companies in Argentina"; (3) "the expected dates of such sales"; (4) "the names of the competitors for such sales"; and (5) "estimates that Sikorsky revenues from such sales would be from $286 million to $565 million." (*Id.* ¶ 53.) On April 16, 2009, UTIO, HSI, and Schweizer each sent letters to Plaintiff at ARA, giving notice that they were terminating their respective sales agreements with ARA, effective June 2009. (*Id.* ¶ 55; Exs. G, H, and I to Third Am. Compl.) However, within days after the termination–notice letters, Perez and Filgueira contacted Plaintiff and told him that "the terminations were not 'final,' that it was certain that the Corporate Defendants would reverse the terminations of the Contracts, and that Mr. Ariztegui should travel to Connecticut to meet at Sikorsky's headquarters to discuss the terminations." (Third Am. Compl. ¶ 56.)

Immediately after the notices of termination were given, Perez "advised Mr. Ariztegui that the termination was because of 'ethical misconduct.'" (*Id.* ¶ 89.) On May 4, 2009, he explained more fully to Ariztegui that Mehta had accused him of bid–rigging, which

Mehta said Plaintiff had admitted, and that Jake Bilstad, an employee of Sikorsky, "had been saying that Mr. Ariztegui and his company had tried to hide the corrosion of the Leased S–76B helicopter from the PNA." (*Id.* ¶ 90.)

On June 4, 2009, Ariztegui, his sub–contractor Ruben Gallo, and Hector Eduardo Iglesias, president of non–party Advent Technology but serving only as Ariztegui's translator, met with Perez and other representatives of Defendants in Connecticut to discuss the termination. During that meeting, Mehta spoke on behalf of HSI and Sikorsky and said that Defendants terminated their contracts with Ariztegui because "they were 'not comfortable' with the telephone conversation between Mr. Ariztegui and the Bell Helicopter maintenance manager that had occurred the Friday night after the bidding on the UH–1H fuel tank procurement had closed, and prior to the opening of the bid on the following Monday morning." (Id. ¶ 93.) The Complaint alleges that Mehta and Alexandra Dolger, in–house counsel for Sikorsky, both said that Defendants were terminating their contracts with Plaintiff "for convenience," and Dolger accused Ariztegui of bid–rigging, stating "you guys talk . . . and its [*sic*] stuff about bids and who's going to bid and what's going to happen." (*Id.* ¶ 94.) Plaintiff alleges that "[w]ithin minutes after the meeting ended, still inside the building where the meeting had taken place, Ricardo Perez informed Mr. Ariztegui, Mr. Iglesias, and Ruben A. Gallo, outside the presence of Mehta and Dolger, that Mehta and Dolger had falsely accused Mr. Ariztegui of ethical violations." (*Id.* ¶ 99.)

Despite notice of contract terminations effective June 2009, Sikorsky requested that Ariztegui visit the purchasing office of the PNA to learn the details of a second public tender by the PNA to formally purchase the Leased S–76B, which he did on April 14 and 20, 2009. On April 21, 2009, while the Contracts were still in effect, PNA Attorney Tomas Romero

Oneto emailed to Ariztegui a guide for gathering required bid documents. That same day, Sikorsky attorney Edward Perrault expressed concern to Oneto that Sikorsky's preferred sale terms might not comport with Argentine legal requirements, which Perrault said might lead to a failed tender. The next day, by email to Plaintiff, Oneto confirmed the accuracy of Perrault's concern—Sikorsky's proposed terms had been presented to the PNA legal office and had failed to meet legal standards. (*Id.* ¶ 62.) Ariztegui nonetheless alleges that in May 2009, the PNA sent Sikorsky yet another formal invitation to provide a new offer to sell the Leased S–76B and that throughout May 2009, Sikorsky violated Argentine criminal law by communicating and meeting with PNA officials about the bid while preparing its offer.

## II. Standards

Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject–matter jurisdiction and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. A case may be dismissed for lack of subject–matter jurisdiction under Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A plaintiff asserting subject–matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists. *Id.*; *see also Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996) ("The burden of proving jurisdiction is on the party asserting it") (internal quotation marks omitted). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

III.     Discussion

A.     Count I:  Breach of contract

1.     *Standing*

As a threshold matter, Defendants argue that Plaintiff's claims for breach of contract and breach of the implied covenant of fair dealing must be dismissed for lack of subject–matter jurisdiction because Plaintiff brought suit in his individual capacity, but only ARA was party to the contracts with UTIO and HSI.  The requirement that a plaintiff prove its standing to bring a lawsuit is underpinned by the Article III case–or–controversy requirement, and is therefore jurisdictional.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000); *see also*, *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006).  "For purposes of determining standing, we must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006).

In order to have standing to sue in breach of contract, a plaintiff must be a party to the contract at issue.  *See, e.g.*, *Chiulli v. Zola*, 97 Conn. App. 699, 705–06 (2006) (the plaintiff, suing in his individual capacity, lacked standing where the mechanic's lien to be foreclosed was filed on the land records in the name of a corporation, and therefore, "in order to have standing to foreclose on the mechanic's lien, the plaintiff would need to bring the breach of contract action on behalf of [the corporation] as either its president or a shareholder"); *Cardi Materials Corp v. Connecticut Landscaping Bruzzi Corp.*, 77 Conn. App. 578, 581–82 (2003) (because the plaintiff was a "corporate entity separate and distinct from" the party to the contract, the plaintiff lacked standing).  Defendants argue that Plaintiff

cannot create standing merely by alleging that he does business as "another entity that is a party to a contract." (Mem. Supp. at 12 (citing *R&B Realty Group v. Heiser*, 322 F. Supp. 2d 206, 210–11 (D. Conn. 2004) (allegations that the plaintiffs did business as a non–registered trade–name without independent legal identity that was a party to a contract with the defendant was insufficient for the plaintiffs to establish standing under the contract)).

However, unlike the parties in *Chiulli* and *Cardi*, Plaintiff does not allege that he did business as another entity. Rather, he argues that he "has always done business with the defendants as just himself," and "[t]here is no legal entity anywhere in the world that has the name Ariztegui Representaciones Aeronauticas." (Mem. Opp'n at 3.) Further, unlike the plaintiff in *R&B Realty Group* that said it did business as the party to a contract, without any supporting evidence, Plaintiff proffers invoices he gave to Defendants that list only his name and require payment only to his bank account, without referencing ARA. Accepting as true Plaintiff's allegation that he "does business in the United States under the name Ariztegui Representaciones Aeronauticas," and construing in Plaintiff's favor the inference that invoices with his name and account only meant he did business with Defendants in his individual capacity, Plaintiff will be deemed to have met his burden of demonstrating his standing at this early stage.

### 2. *Failure to state a claim*

Defendants also argue that aside from Plaintiff's allegations that Defendants end–ran him by invoicing the PNA directly and failed to pay him commissions for his services in conjunction with those invoices, Count I otherwise fails to state a breach of contract claim because UTIO's failure to compensate him for providing assistance "in resolving its disputes with the PNA concerning the discovery of corrosion in the Leased S–76B," (Third Am.

Compl. ¶ 105) and HSI's failure to compensate him for providing "valuable assistance to HSI in resolving its disputes with the PNA concerning assessment services," (*id.* ¶ 109) do not constitute breaches of either the UTIO SRA or HSI SRA. Indeed, Article III in the UTIO SRA and the HSI SRA, on Commission for Services Rendered, delineates the specific services for which ARA would be entitled to commissions, including sale and export of product, and neither includes compensation for resolving disputes with purchasers.

Plaintiff nonetheless maintains that Defendants breached their contracts with him by using his services in a manner that was not contemplated and that resulted in damage to his reputation. Specifically, he alleges that UTIO and HSI breached Article II.B of the UTIO SRA and HSI SRA respectively, because they made "unreasonable" requests of him by asking him to "bear the brunt of the President's anger" about the corroded helicopter and HSI's refusal to supply parts to the PNA until PNA paid the assessment invoice (Pl.'s Mem. Opp'n [Doc. # 37] at 7), but points to no supporting language in the contracts obligating UTIO, Sikorsky, or HSI to make only reasonable requests of Plaintiff. Ariztegui also argues that by deceiving him into thinking that it would deliver a formal quote that he could then present in a formal bid for fuel tanks, but failing to follow through, HSI and Sikorsky breached the HSI SRA and ISA, because if HSI had provided a bid, it could have resulted in a sale and a commission to him. However, the HSI SRA and ISA only entitled Plaintiff to commissions upon actual sales of products, not potential sales that never materialized for whatever reason. While Plaintiff's work towards producing sales included researching potential bids, he was not contractually entitled to any compensation for his research if Defendants ultimately declined to place bids or the bids were rejected.

In sum, because HSI and Sikorsky were under no obligation to pay Plaintiff commissions for bids that were never presented, were under no obligation to place bids, and dispute–resolution with purchasers was not expressly identified as work for which ARA would be paid, Plaintiff's breach–of–contract claims are dismissed, except where predicated on not paying Ariztegui for commissions owed on sales.

B.       Count II:  Quantum Meruit

Defendants move to dismiss Plaintiff's *quantum meruit* claims in Count II on the grounds that  an express contract governs the relationship between the parties, which would bar a *quantum meruit* claim.  "Parties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations," such that when an express contract exists, a *quantum meruit* claim is properly dismissed. *See Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 128 (2d Cir. 2004).

Plaintiff clarified in his opposition that his *quantum meruit* claims are based only on Defendants' failure to provide him with commissions for the services he provided them after the April 16, 2009 notice of contract termination.  He maintains that "[i]n reliance on the representation that the terminations were not final and would be reversed, Mr. Ariztegui continued to work with the corporate defendants as they requested," even after he was notified that the contracts were terminated, and therefore, he is entitled to *quantum meruit* damages.  (Mem. Opp'n at 10.) Ariztegui cites *Unger v. Greenhut*, 183 F.2d 381 (2d Cir. 1950) for the proposition that after contract termination, a party may recover for services under *quantum meruit* at the rate at which he would have recovered under the contract. However, all of the services Ariztegui alleges providing to Defendants were undertaken during the notice period and before the June 2009 termination date.  Because compensation

for his services was governed by the Contracts until they ended, regardless of his belief that the Contracts would not thereafter actually be terminated, he is not entitled to damages in *quantum meruit* for services during the life of the contracts, and Count II is dismissed.

C.    Count III: Defamation

Defendants move to dismiss Ariztegui's defamation claims in Count III on the basis that the allegedly defamatory statements were protected by a qualified privilege as communications among the Defendants about Ariztegui's performance as their independent contractor.[3]  Ariztegui counters that the statements were not privileged, as they were not intracorporate but were between individuals from HSI and Sikorsky and were made in the presence of outside individuals.

"To establish a defamation claim under Connecticut law, a plaintiff must prove that the defendant published unprivileged false statements that harmed the plaintiff." *Cweklinsky v. Mobil Chemical Co.*, 297 F.3d 154, 159 (2d Cir. 2002) (*Cweklinsky I*) (citing *Torosyan v. Boehringer Ingelheim Pharms. Inc.*, 234 Conn. 1, 27 (1995)).  A qualified privilege protects "communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination," because "[s]uch communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business." *Gambardella v. Apple Health Care, Inc.* 291 Conn. 620,

---

[3] Defendants also argue that all alleged defamatory statements are statements of opinion, and "[t]o be actionable [defamation], the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing mere opinion." *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 795 (1999).  However, several of the allegedly defamatory statements were factual, not opinion, including Mehta's accusation of Plaintiff's confession to bid–rigging and Bilstad's claim that "Mr. Ariztegui and his company had tried to hide the corrosion of the Leased S–76B Sikorsky helicopter from the PNA."  (Third Am. Compl. ¶ 90.)

630 (2009) (quoting *Torosyan*, 234 Conn. at 29)).[4]  Courts have extended this privilege to communications about the performance of independent contractors, such as Ariztegui.  *See, e.g.*, *Danawala v. Houston Lighting & Power Co.*, 14 F.3d 251 (6th Cir. 1993) (qualified privilege applied to intracorporate communications leading to termination of independent contractor).

Plaintiff argues that the alleged defamatory statements by Schierholz in front of Mehta and the later discussions about those accusations among Plaintiff, Mehta, Schierholz, other Sikorsky representatives, Gallo and Iglesias do not enjoy any privilege because they were not intracorporate communications.  While the participants in the discussions about Plaintiff's bid–rigging or concealment of helicopter corrosion were employed by different corporations, this Court will apply the privilege here because these individuals "needed to be able to exchange information not only within but between their individual companies in order to make 'efficient, intelligent employment decisions.'" *Julian v. Securitas Sec. Services USA, Inc.*, No. 3:08cv1715(MRK), 2010 WL 1553778, * 5 (D. Conn. Apr. 19, 2010) (statements made between employer and company providing security for employer about employee's computer use were protected by privilege); *see also Miron v. Univ. of New Haven Police Dep't*, 284 Conn. 35, 43–47 (2007) (communications between former employer and a potential future employer were protected); *Hanna v. InfoTech Contract Svcs.*, No. 3:01cv680(SRU), 2003 WL 2002773, * 10 (D. Conn. Apr. 21, 2003), *aff'd by* 91 F. App'x 737,

---

[4] In discussing this privilege, *Torosyan* cites to the Restatement Second of Torts, § 596 ("[a]n occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know) and comment (d) to that section ("Persons associated together in professional activities are . . . within the rule stated in this Section.").

738 (2d Cir. 2004) (qualified privilege applied in the context of communications between Pfizer and a company providing IT services to Pfizer).

It is undisputed that all allegedly defamatory statements were made in the context of discussions about Plaintiff's conduct while acting as Defendants' contractor and among parties who each had an interest in Plaintiff's relationship with Defendants.[5] Thus, Schierholz's ethical–misconduct accusations about Plaintiff to Mehta and their discussion of those accusations during the subsequent meeting are protected by privilege, and as Plaintiff makes no allegation that the statements were made with actual malice, he has failed to allege facts that overcome the privilege. *See Hopkins v. O'Connor*, 282 Conn. 821, 845 (2007) ("[T]he malice required to overcome a qualified privilege in defamation cases is malice in fact or actual malice."). Count III is therefore dismissed.

D.    Count IV: Breach of the implied covenant of good faith and fair dealing

In Count IV, Plaintiff claims breach of the implied covenant of good faith and fair dealing by UTIO, HSI, and Schweizer, for failing to compensate Plaintiff for certain services performed and for unjustifiably terminating the contracts. The covenant of good faith and fair dealing requires a showing that (1) a plaintiff and defendants were parties to a contract

---

[5] With respect to the presence of Gallo and Iglesias during this event, the Court is persuaded by the proposition that "[p]ublication to an agent of the plaintiff who is acting at plaintiff's behest and on his behalf is tantamount to a publication to the plaintiff himself, and as such does not fulfill the publication requirement." *Delval v. PPG Indus., Inc.*, 590 N.E. 2d 1078, 1081 (Ind. App. 1992); *see, e.g.*, Restatement 2d Torts § 577, cmt. (e) ("[I]f the [allegedly defamatory] communication is in answer to a letter or a request from the other or his agent, the publication may not be actionable in defamation."); *Eggleston v. Klemp*, 295 F. App'x. 233, 234 (9th Cir. 2008) ("Publications made to agents of the complaining party will not support an action for defamation when the complaining party or his agents induced the publication.").

under which the plaintiff expected to receive certain benefits; (2) the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and (3) that the defendant was acting in bad faith. *See Travelers Property & Cas. Ins. Co. v. Triton Marine Construction Corp.*, 473 F. Supp. 2d 321, 330 (D. Conn. 2007). "Bad faith means more than mere negligence; it involves a dishonest purpose." *Hudson United Bank v. Cinnamon Ridge Corp.*, 81 Conn. App. 557, 576 (2004).

Plaintiff's Complaint asserts several grounds for this claim. First, he alleges that "UTIO, HSI and Schweizer . . . breached the covenant of good faith and fair dealing by attempting to justify termination of their agreements with Mr. Ariztegui due to purported 'ethical issues,'" which were "a pretext for a termination that appears to have had no purpose or effect other than to eliminate Mr. Ariztegui as a potential obstacle to the actions [Defendants] planned to take that were contrary to Argentine law." He claims his contracts were pretextually terminated only after he "delivered his 'sales funnel' containing valuable commercial information developed through his own effort and delivered to the Corporate Defendants with the expectation of a continued relationship that would enable him to develop prospects, close sales commissions and earn commission income." (*Id.* ¶¶ 132, 134–35.) However, Plaintiff does not allege that Defendants improperly sought or used the information in his sales funnel. Thus, Plaintiff's claim that Defendants breached the implied covenant by pretextually terminating the Contracts that did not require any cause basis for termination does not state a claim for breach of the implied covenant.

Plaintiff next incorporates his allegations that Defendants would not compensate him for his dispute–resolution services, failed to follow through with a bid for the UH–1H tank procurement after asking Plaintiff for pricing information, and failed to compensate him for

his work resolving the dispute with the PNA related to the corrosion in the Leased S–76B. (*Id.* ¶ 131.) But Plaintiff alleges neither that Defendants undertook these actions in bad faith, nor facts from which bad faith can be inferred.

Plaintiff also alleges that Defendants compromised his relationship with Argentine governmental authorities and engaged in "certain activities in support of the effort to sell the Leased S–76B which . . . were in violation of Argentine law." (*Id.* ¶¶ 131, 133.) Plaintiff offers no basis for either his claim of entitlement to good governmental relations or Defendants' obligation to sustain such relations, and such allegations that Defendants compromised his relationship with the Argentine government fail to state a claim for breach of an implied covenant.

Finally, Plaintiff alleges that Defendants led him to believe that the contract terminations were reversible, which he says induced him to continue to work after notice of termination was provided (but while the Contracts still remained in effect). (*Id.* ¶ 131.) Again, Plaintiff does not allege that Defendants did so in bad faith, and therefore, this allegation cannot give rise to a breach of the implied covenant claim.

Thus, Count IV is dismissed, with the exception of Plaintiff's allegations that UTIO invoiced the PNA directly, not through ARA, to avoid paying Ariztegui commissions, which Defendants concede states a claim for breach of the implied covenant.

E.      Count V: CUTPA, Conn. Gen. Stat. § 42-110b(a)

Finally, Plaintiff alleges that Defendants violated CUTPA, because "[i]nsofar as the Defendants' actions in connection with the sale of the Leased S–76B violated Argentine law regarding public bidding on potential purchases by the Argentine government, they were also unfair, unethical, oppressive and unscrupulous in that they violated the Foreign Corrupt

Practices Act ("FCPA"), 15 U.S.C. §§ 78dd–1, 78dd–2" and therefore violated CUTPA. (Third Am. Compl. ¶ 140.) He also alleges that Defendants engaged in "unfair, unethical, oppressive and unscrupulous actions," through: HSI's failure to compensate him for resolving the PNA–assessment dispute; HSI's failure to bid on the UH–1H tank procurement after Plaintiff delivered pricing information; Sikorsky's failure to compensate him for his dispute–resolution work following discovery of corrosion in the S–76B helicopter; Defendants' agents misrepresenting that the contract terminations were reversible; Defendants' basing contract terminations on "ethical issues" "to eliminate Mr. Ariztegui as a potential obstacle to the action they planned to take that were contrary to Argentine law"; Defendants' actions related to sale of the Leased S–76B "in violation of Argentine law"; and Defendants' notice of termination immediately after Plaintiff's sales–funnel delivery. (Third Am. Compl. ¶ 139.)

   *1. Standing*

   Defendants argue that Plaintiff lacks standing to bring a CUTPA claim as a "business person," *see Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 496 (1995), because he was Defendants' independent contractor, which Defendants suggest is akin to being an employee and because he was contractually precluded from being their competitor.[6] CUTPA can apply to injuries to consumers, competitors, or other businesspersons. *See Edmands v. Cuno, Inc.*, 277 Conn. 451 n. 9 (2006). However, the Connecticut Appellate Court has excluded the employer–employee relationship from the definition of trade or commerce for the purposes

---

   [6] Article IV.B of the SRAs provides that Ariztegui will not "promote, deal in, or have substantial financial interest in the sale of any product anywhere in the world . . . in competition with the PRODUCTS during the term of this AGREEMENT, unless mutually agreed to in writing by the parties."

of an action under CUTPA, *see Quimby v. Kimberly Clark Corp.*, 28 Conn. App. 660, 670 (1992), which several Connecticut Superior Court opinions have since extended to the relationship between a company and its independent contractor, *see, e.g., Kelly v. Noble Envtl. Power, LLC*, No. CV085005444, 2009 WL 3087217, * 8 (Conn. Super. Sept. 2, 2009) ("In the present case the plaintiff has alleged that he was an independent contractor of the defendant, however, he has not alleged any activity on the part of the defendant that would take this action out of the realm of the employment context and into the realm of anti-competitive behavior covered by CUTPA."); *LaVallee v. Capital Elec. Constr., LLC*, No. CV020512659S, 2004 WL 870667, * 2 (Conn. Super. Mar. 1, 2004) (plaintiff independent contractor failed to establish CUTPA violation because he failed to demonstrate a competitive injury). An exception exists where a defendant undertakes "actions outside the scope of the employment relationship designed 'to usurp the business and clientele of one corporation in favor of another,'" actions which "fit squarely within the provenance of CUTPA." *Ostrowski v. Avery*, 243 Conn. 355, 379 (1997) (quoting *Fink v. Golenbock*, 238 Conn. 183, 212 (1996)).

While Plaintiff's CUTPA claim largely stems from conduct covered by his relationship with Defendants as their independent contractor—for instance his allegations that Defendants failed to compensate him for dispute–resolution services and never placed a fuel tank bid—construing in Plaintiff's favor his allegation that Defendants waited to notify him of the planned termination until after he presented his sales funnel with valuable commercial information, it could implicate competition between the parties after termination of the Contracts, and the Court will assume that Plaintiff has demonstrated standing under CUTPA on this point.

## 2.    *Failure to State a Claim*

However, Plaintiff has failed to allege sufficient facts to establish conduct that falls within the penumbra of CUTPA violations.

> It is well settled that in determining whether a practice violates CUTPA [Connecticut courts] have adopted the criteria set out in the cigarette rule by the Federal Trade Commission for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.

*Edmands.*, 277 Conn. at 450 n. 16 (internal quotations and alterations omitted).

First, Defendants argue that Plaintiff failed to allege any violation of the FCPA, the elements of which are that the defendant is (1) "a domestic concern"; (2) "that made use of a means or instrumentality of interstate commerce"; (3) "corruptly"; (4) "in furtherance of an offer or payment of anything of value to any person"; (5) "while knowing that the money would be offered or given directly or indirectly to any foreign official"; and (6) "for purposes of influencing any act or decision of such foreign official in his official capacity." *Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. S.E. Schreiber*, 327 F.3d 173, 179–80 (2d Cir. 2003).

Although Plaintiff alleges that Defendants met with PNA officials to review the documents Sikorsky planned to submit to the Argentine government and submitted bid documents prior to the public opening of a bid, Plaintiff never alleges that Defendants bribed

Argentine officials, or gave them something of value "corruptly," *i.e.*, with "an evil motive or purpose, an intent to wrongfully influence the recipient." *Id.* at 182 (quoting S.Rep. No. 95–114, at 10 (1977)). Plaintiff alleges in paragraph 140(a) of the Complaint that "[t]he Defendants provided a thing of value to PNA officials in the form of assistance to and collaboration with PNA officials in the preparation of a proposal subject to review by Argentine authorities independent of the PNA," which Plaintiff's counsel clarified during oral argument referred to collaboration on the bid documents for the S–76B helicopter the PNA sought to purchase from Defendants. Even if Defendants conferred with PNA authorities on bid documents, whether and how the PNA accrued value from such meetings is lacking in the Complaint. Further, while Plaintiff repeatedly asserts in the Third Amended Complaint that Defendants violated Argentine law, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 129 S. Ct. at 1949. Plaintiff's factual allegations fail to allege an FCPA violation, which is a predicate for the claim of CUTPA violation.

Plaintiff's non–statutory allegations are also insufficient to state a CUTPA claim. As discussed above, because Plaintiff had no contractual right to commissions for dispute–resolution services, he was not entitled to commissions for unsuccessful or unmade bids, the contracts could be terminated for any reason with sufficient notice, and Plaintiff does not allege that Defendants intended to misuse his sales funnel information,[7] Plaintiff

---

[7] This case is distinguishable from *Fabri v. United Tech. Int'l, Inc.*, 387 F.3d 109 (2d Cir. 2004), referenced by Plaintiff, in which a sales representative for Sikorsky in Argentina sued UTIO for breach of contract, quantum meruit, breach of the implied covenant, and CUTPA violation. In *Fabri*, the sales representation agreement allowed for termination for any reason with adequate notice and for immediate termination for conduct that may violate the FCPA. The defendants terminated their contract without 30–day notice to the Fabri's,

has failed to allege any common–law violation that would fall within the penumbra of CUTPA, and Count V will be dismissed.

III.    Conclusion

Accordingly, Defendants' [Doc. # 31] Motion to Dismiss is DENIED as to Plaintiff's breach of contract and breach of the implied covenant claims against UTIO based on Plaintiff's allegations that UTIO invoiced the PNA directly to avoid paying Plaintiff commissions owed, and Defendants' motion is GRANTED as to all other claims and all other Defendants.

IT IS SO ORDERED.

/s/
_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 28th day of March, 2011.

---

based on their belief that the Fabris were engaging in corrupt activities. Unlike this case, in which Defendants terminated their contracts with Plaintiff with adequate notice, in *Fabri*, the evidence of whether there was reason to believe that the plaintiffs had engaged in corrupt conduct remained in dispute.